Please be seated. I will take up our next case, Wild Virginia v. Council on Environmental Quality. Ms. Hunter. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Kim Hunter with the Southern Environmental Law Center, and I have Nick Torrey and Megan Kimball with me here at Council Table. And we represent the 17 conservation groups who are plaintiffs in this case. Your Honors, the National Environmental Policy Act provides... One of the first questions I'm sure you're going to get from this is, you've had this policy and now the Biden administration is working through it. You've got a lot of other cases similar to this. How in the world would we just hold this thing, let's see how it's going to pan out for you? It looks like to me it's going in your direction. Well, certainly, Your Honor, two years ago when we were arguing this case before the district court, a little less than two years ago, that might have been the case. And at that time, the Biden administration... What would have been the case? That you would hold an embassy? That things look like they would be heading in the direction that our plaintiff groups would like them to, and that we would have... When did you argue before the district court? I'm sorry, Your Honor? When? Oh, the date? We argued in, I think, January of 2020, so right after the election. And at that time, certainly... Well, it had to have been 2021.  At that time, the Biden administration was making representations that they were moving forward to fix some of these problems with the rule that had been put in place by the Trump administration. And they put in their briefing and submitted to the court at that time that there would be a two-phase rulemaking. And the first phase of that would fix some very discrete problems, and that has been completed. And we are appreciative that those particular problems have been fixed. But this is a massive rulemaking. The aspect of the courts getting involved in it at this point. I mean, you've got an administration. You know these things take time for new registration. Otherwise, it would be arbitrary and capricious. And so the two-phase process is going forward. It's not like they haven't done it. It's going forward, but maybe not at the speed you want it to go. Is that what you're saying? Respectfully, Your Honor, I would respond to two things. First of all, the Biden administration stated that the second phase of their rulemaking would be completed by the June of this year. That has not happened. We haven't seen any advance notice of rulemaking. There's a lot of things that we thought would be happening by June of this year. There's the political side of these things, but my point being is it's going somewhere. I mean, we could hold on to this case for, who says you're going to get a decision from us any time soon. You may be complaining. We figured that we'd get something by December. You might not get something until next summer. And by then, you've got something. But the point being is something is being done, has already been done. Much of what you brought in has been taken care of. And it's moving in that direction. I mean, at some point in time, there's a separation of powers issue to consider. And that is, yeah, we could, but, you know, the administration, the executive branch is moving in a direction on this. And it just seemed reasonable to do it too, right? Well, respectfully, Your Honor, other courts have stepped in where plaintiffs are being harmed. And if I could say just to make two points on that. Respectfully, other courts have done what? Other courts have stepped in and have vacated rules from the Trump administration, regardless of the fact that there's a new. It's held it in abeyance pending. Oh, you mean this particular one? Yes. Which courts have done that? Plaintiffs in those cases do not have the concrete injuries that our plaintiffs have, perhaps. I don't know. I don't represent the plaintiffs in those cases. But if I could make two points. First of all, the Biden administration actually made clear in their phase one rulemaking that they do not intend to fully rescind all of the harms that was set in place by the Trump rulemaking. In fact, they said. Yes, which ones they're going to do it, which ones they're not. Well, we don't need to guess, Your Honor, because what we do know is that the law in place today is the law which is governing all rulemakings today and has been the law which has governed all rulemaking since September rules and NEPA processes since September of 2020. And we also know that our plaintiffs today are being harmed by that rulemaking. And then there's an additional point. Which rulemaking are you talking about? Are you talking about the original rule from 2020? Yes, Your Honor. You're not talking about the rules that each of these agencies are going to develop that implement that rule as they see it. Well, if I could correct a misconception from the district court, Your Honor, the way that NEPA works and the way that the Supreme Court has been clear that NEPA works and CEQ agrees that NEPA works as these CEQ rules are the governing principle that govern all federal agencies today. They are binding law on all federal agencies. And that's from the Andrews case. And that is clearly stated in the regulations. But here's something. Have they actually done any of that? Or are you in a position where it could happen because, as you say, it's binding? Has anything actually happened? Yes. Yes, Your Honor. Just yesterday, for example, I was informed that plaintiffs in this case, who are the Caspaster River Association, are now facing a new timber harvesting project at Anchor Knob, which is in that vicinity in Virginia. And what they are finding is because the new rule is in place, the Forest Service is no longer conducting the same on-the-ground fact-finding that it would have had to do prior to the rule being in place. So why don't they challenge that, just like the Supreme Court said in Ohio Forestry? Well, Your Honor, this court has been very clear that we don't have to wait for the consummation of injury to occur. Yeah, but in the example you gave, that certainly seems like an Ohio Forestry case. In that situation, the plaintiff's harm is not the environmental harm on the ground as it was in Ohio Forestry. In Ohio Forestry, which was brought under a substantive statute, the harm at issue was the harm to the forest. And what the court would have had to look at was whether the action was going to actually harm those people. The harm here is to the plaintiffs themselves, the plaintiffs' behavior, and what the plaintiffs are having to do in that case and a whole host of other circumstances. Like, for example, plaintiffs concerned about new poultry farms in eastern North Carolina, which are harming their communities. What they're having to do is expand resources they previously didn't have to do to do fact-finding for themselves because the federal government is no longer required to do the fact-finding and no longer required to give the notice that it has previously been required to do under the long-standing NEPA regulations. And we have declaration testimony in the record showing how our plaintiffs have already adjusted their behavior because this new rule is the law of the land today. And yes, we can hope that the Biden administration at some undetermined point in the future will fix it. To really get to the heart of it in terms of the issue of forest, the standing and rightness of this case, aren't we to look at jurisdictional consideration from the time that you filed the lawsuit as well as throughout that suit? Yes, Your Honor. Look at it from that light, how in the world is it foreseeable this forest plan issue was foreseeable? Well, I was telling you about the forest plan because you asked about what has happened in the past year and a half. You tell me about it. I'm getting to the standing issue in terms of where we are right now today. And some of the considerations that you bring up when we look at what those things are at the time you filed the suit. Absolutely, Your Honor. In terms of where you go with that. Right. And at the time we filed the suit, this was a rule which was issued by the Trump administration with big fanfare about how this was cutting NEPA regulations and eliminating red tape and plaintiff groups at that time who had been using NEPA consistently for years as a tool to fulfill their organizational missions. Both by getting notice, getting information and submitting their comments because as this court has recognized NEPA as a democratic decision making tool. At the time that rule was issued, it was extremely foreseeable that they would be impacted. And in fact, they immediately were impacted because they immediately had to shift their behavior to adjust for this new scheme, which is still in place today, on which we have actually seen no concrete promise from the Biden administration that there will be a restoration to the previous scheme. And some of these changes. Excuse me, I'm in sort of all of your, I'm sure, very erudite discussion. I'm losing track of the fact that the prior administration's rule that you objected to is gone. Right? No, Your Honor. It's been vacated. It's not being enforced. Okay, you tell me what the status is and then we'll hear what the United States has to say. Yes, Your Honor. The rule is in place today and if you look at it. But is it being enforced? Yes, Your Honor. It is the law and I can quote to you from Section 1506.13 states, the regulations in the subchapter apply to any NEPA process begun after September 14, 2020. And that is the law today. This rule is binding on all federal agencies. Maybe we can get to it. Yeah. Telling me only the facts and argument on your side and not addressing what at least the other side says. Absolutely.  And unfortunately, there was a misrepresentation made by counsel who is no longer counsel in the district court that these rules could not go into effect until other agencies made their own implementing regulations. And that fact is not correct and that is belied by the plain text of the regulation. And is that in the district court's opinion? Yes, it is. That is the basis for its holding? Is that what you're telling me? That is in part the basis of it. What are the grounds, Your Honor? Well, Your Honor, the district court based a lot of its opinion on Ohio forestry, which I was just discussing with Judge Agee, is a very different factual circumstance and legal circumstance to the one we have here. And largely that's because NEPA is a procedural statute that guarantees procedural rights. And so the plaintiff's harms are the loss of that procedural right, they're not the loss of the harms on the ground. The rightness question is also really different than Ohio forestry, because in Ohio forestry, what the court had to do was... Are you claiming that your injury now is a informational injury? Your Honor, the plaintiffs do have informational injuries as well as the loss of procedural rights that they are guaranteeing. A lot of plaintiffs haven't gotten a very good reception. Well, Your Honor, this court... weighs things differently in terms of the information they're going to give out. Everybody has standing. That's exactly correct, Your Honor. And that's why what the courts have said is that that informational injury needs to be tied to a concrete injury that is particularized to the group in question. And that is precisely what has been demonstrated in the declarations here. These are not groups just saying, generally, we wish we had more information. These are groups saying, we have a longstanding practice of using the NEPA process to get information, for example, about new poultry farms in our neighborhood. They have declared and sworn testimony that has not been disputed that this is the tool they have used. And they have subsequently lost that tool. It was like a radar out there, which they could know, okay, we know that this poultry farm is coming up. We can tell our clients about it. We can submit comments. And that radar for them has gone dark. You're saying that without this, there's no way they're going to know there's a new poultry farm going in? Yes, Your Honor. These are very small groups. For example, Kemp Burdette, who's a plaintiff in this case, he runs the Cape Fear Riverkeeper. And it's really just him and some volunteers. And the rest of the time, he's literally kayaking up and down the river, looking for harms in the river. He's doing volunteer cleanups. He's doing fundraising. And what he has declared in his testimony is without this tool, which he has relied on, and he's certainly by many means not the only one, without this tool, he has to shift his attention to doing that fact-finding. And that takes him away from things like the river cleanups or the fundraising. And that is a recognized injury by this court and by the United States Supreme Court when you have to adjust your behavior. That declaration indicated that this was not going to be forced against that controlled animal feeding operation. What does that mean? Well, NEPA is not really about enforcement, Your Honor. NEPA is about the guarantee of procedural protections to the natural environment and that no federal project can proceed without them. Well, we don't know whether or not that particular – one particular agency official cannot just vacate a case by saying they voluntarily will choose to violate their own law. So what are you going to do? How are you going to make them do it? They say, we're not going to do it. Now you want the suit to say, don't do it. And so then I'm trying to understand. What does it mean when – you've got an administration that's moving directly, and yeah, it's not gotten rid of the whole matter, but there are at least two or three things that you file in your complaint that are clearly now moved as a result of phase one. Yes, Your Honor. Right? Absolutely, Your Honor. And then you've got this exemption with this CAFO that's there. And, I mean, there's movement. And we also know you can't just change a regulation overnight. Mike would like to when you come in as the new president. You've got to go through a whole process. Otherwise, it's arbitrary and capricious. And it's moving in that direction. And at least something seems to be happening. You're shaking your head. But at the same time, I guess the question has been here, how much is being enforced? But when it says it's not enforced, at least as the CFO, I was asking, what does that mean? And I don't know. I'm just – this is new stuff to me. When you said portraits, it sounded back to me as animals somewhere in there. When you're dealing with a controlled animal feeding operation. So what does that affect? And your point being the fact you don't enforce it means it's still there. Is that it? I think the fact that our plaintiffs no longer have a law in place, which says that these types of poultry farms are subject to NEPA, and that they will get that notice and that opportunity to participate in the process, is the injury to them because they have had to shift resources to do that work themselves. And I'll reserve the rest of my time. All right. Thank you very much. Mr. Brabender, we'll hear from you. Yes, thank you. May it please the Court, my name is Alan Brabender, and I represent the Council on Environmental Equality. Although this spatial challenge was inappropriate from the start, subsequent events now show just how wrong plaintiff's speculation turned out to be. For instance, when they filed their complaint in July 2020, they couldn't predict the results of the 2020 election. Now, CEQ under the Biden administration is committed to revising the 2020 rule in such a way as to avoid the kinds of harms that plaintiffs speculate could occur. Where did we find that? I tried to tease that out of your colleague, but he wasn't going there. You say the Biden administration has said that it's going to… It is committed to revising the… Okay, so where do I find that in the record? It is… We provide citations to the notice and the rulemakings in our briefs, Your Honor. I thought that her response was that somebody misstated that in the district court counsel that is no longer representing you all. Sure. I think that pertains to a different issue, but let me speak to that. Okay. The former AAG said something along the lines of the 2020 rule is a rule above all rules that has no immediate effect. That has what? No immediate effect. That actually is a true statement. Now, I think the district court mistook that to mean that the 2020 rule couldn't take effect until these other federal agencies promulgated their own internal regulations. That's not true, but the 2020 rule is in effect. Judge Jones was still correct that this case is not ripe because it is not fit for review under the National Wildlife Federation case and because the hardships, the relative hardships, weigh in favor of finding this case not to be right under Ohio Forestry. But your opposing counsel says that even in those situations where they're not awaiting further rulemaking on a particular project,  is that because we're not getting the information that we received before, our groups are having to act differently now, and that that injures us from a constitutional perspective. So plaintiffs are speculating that they won't receive information. There has been no denial of information as of yet. And so they're taking actions based on this speculation of non-imminent, non-concrete harms, which the Supreme Court in Clapper said isn't sufficient. Excuse me. Are you providing the information that was provided before the Trump rule? Well, that depends on how any agency may interpret and apply the rule because the rule is not self-implementing. It can only have effects to the extent some other federal agency applies it during its own project decisions. Well, I thought your representation just 30 seconds ago was that they're saying they didn't get the information, but they do. But now you're telling me it depends on other agencies. Well, I'm saying— I'm sorry. Go ahead, Your Honor. Are they getting information or not? It depends on how another federal agency— they're speculating that they're not going to get the information because another federal agency is not going to give it to them. For instance, much of their claims of harms are based on the notion that the 2020 rule deleted the definitions of indirect and cumulative, and therefore they're not going to get the types of information on impacts that were previously classified as cumulative, such as climate change impacts, for instance. But what we're saying is they have no idea whether or not some agency is going to analyze climate change in their decisions or not. They're speculating that they won't because of the 2020 rule, but that's just pure speculation, and that's the kind of information they say that they're not getting. But they have no basis for that speculation. Well, I understood opposing counsel to give us an example of something that apparently happened just in the last few days. Now, whether or not we can take that into account a year or two years after filing of the suit is a different question, but they're saying that there was some forestry project and NEPA directly affected the information they would receive, I presume, without further regulation from the U.S. Forestry Service or whatever agency handles that. Sure, and I'm not familiar with the project they're discussing, but I would doubt that's the case. Because CEQ has extended the deadline for agencies to promulgate their own internal regulations implementing the 2020 rule, agencies have responded by continuing to apply their internal regulations implementing that 1978 rule. And so I'm unaware of any project on the ground. So they're implementing now the same regulations that existed before the 2020 rule? They continue to apply their internal regulations because they haven't promulgated new regulations under the 2020 rule yet. And so because of that, I'm unaware of any project. And, of course, there are NEPA challenges out there, but I'm unaware of any NEPA challenge where the argument is that the harm is caused by the 2020 rule as distinguishable from the 1978 rule. We're aware of no case where the argument is the 2020 rule itself caused the harm. And a large part of why plaintiffs' declarations are filled with speculation is that they filed two months before the rule even took effect. And even two months later when the rule was scheduled to go into effect, in order for the rule to… We're talking about the Trump rule, right? Yes. Okay. And so even two months later, for the rule to have effect, some other federal agency is going to have to apply its rule to its own decision. But that NEPA process takes months and sometimes years, such that when the plaintiffs filed their suit in July 2020, any concrete application of the 2020 rule was left out in the distant future. And because of this, the declarations that plaintiffs submitted with their complaint are necessarily and fatally based on pure speculation about what some federal agency might do in the future that might cause them some harm. And that's just a sort of speculation and guesswork, which does not amount to Article III case or controversy. What is the status of the 2020 rule now? Well, it is still in place, although it has been revised by CEQ's Phase I rulemaking, which did some important things. It reinstalled the definitions of indirect and cumulative, and it made clear that the 2020 rule is the floor and not the ceiling for environmentally protective NEPA procedures. Now, the adoption of Phase I means that the predicted harms that plaintiffs speculate could occur now will not occur, because many of the harms were based on speculation that some federal agency might not analyze an impact that was previously classified as indirect or cumulative. And they speculated from there that this could cause environmental consequences, it could deprive them of information, and they would therefore have to divert resources to get this information. But, of course, now the Phase I rule restores those definitions, so these harms will not occur. Other harms are based on whether or not an agency may decline to consider their comments or may forego NEPA altogether. But these harms, in addition to being speculative, are based on the notion that the 2020 rule created a ceiling. They would claim, for instance, that the federal agencies have no choice but to apply what they call the heightened public participation requirements or they have to exempt projects from NEPA. Salary, are you aware of any agency that would be controlled by NEPA that has actually promulgated regulations under the 2020 rule? I do not believe any agency as of yet has promulgated comprehensive regulations implementing the 2020 rule, because it would be a waste of time. They know that the Biden administration is hard at work revising the 2020 rule, such that it wouldn't be prudent to waste resources. How do we know that? Based on what I'm telling you, Your Honor, I don't know if there's anything that you can look at. If you want, I can give you an example. He said June of 2022. They had those 48 meetings, according to that Southern District of New York case up there with the CEU, and had all those meetings, and nothing was going on. Right. The fact that there is, in fact, no regulation out there shows that they're not working on it. I didn't hear that. In fact, there is no comprehensive regulation implementing the 2020 rule. These agencies are not making it a priority. They're what? They're not making it a priority to adopt new regulations implementing the 2020 rule. Well, what are we to make of that? These plaintiffs are here in court with their claims, and you're saying, well, we're going to make a rule that makes us all ridiculous, but we're taking our time. No, what I'm saying is – I'm not saying that, Your Honor. I was responding to the questions about the status – What is the information that you gave my colleague to make your response? You're right. You didn't say that. So what is your response to the fact that there hasn't been any action? Well, CEQ is a small agency. It is hard at work on a comprehensive revision. It has had dozens and dozens of meetings with interested stakeholders. It's going to take some time. Yes, it's true that they originally targeted June 2020, June 2022, and that's unfortunately been prolonged. But CEQ is hard at work on a rule. It sounds like it's very possible that there will be another election, and then this rule will be back in effect, right? The way it exists right now. It's possible. That's true with respect to any rulemaking. You know, at the change of – But not any rulemaking is in front of us. True. True. But, of course, jurisdiction is assessed at the time the complaint was filed. And at the time the complaint was filed, plaintiffs just don't have the facts to show that there was a ripe controversy or that they had standing. And let me address this claim regarding the concentrated animal feeding operations. Yesterday in their 28-J letter, they claim that these exemptions for the CAFOs, as they're called, is automatic, which is not the case. There's no provision of the 2020 rule that's automatic. Some federal agency, some federal decision-maker has to make a decision to apply it. And as a fact of the matter, the Farm Service Agency has not been using this exemption. And the fact that the Phase 1 rule now makes the 2020 rule the floor, not the ceiling for environmentally protective procedures, means going forward the FSA could continue to do EAs or EISs or whatever they would like to do on these loan guarantees. I'd also note that plaintiffs' claims here are speculative. As Judge Jones said, this is, out of all of the speculation, this is some of the more attenuated speculation because plaintiffs don't cite an example of a single operation in a geographic area in which they have interest. There's no proposal that they cite. So what they are saying is that there seems to be some statistical probability or reasonable likelihood that some private organization may try to locate an operation in a geographic area where they have interest. But post-Summers and post-Clapper, that kind of reliance on statistical probability or likelihoods is not enough to justify Article III jurisdiction. From there, there's more speculation. So they speculate a private entity may locate an operation in a geographic area. They speculate that they will apply for a federal loan guarantee. They speculate that the FSA will grant that guarantee. And they speculate that it will do so without doing NEPA. And then they further speculate that the reason they didn't do NEPA was the 2020 rule as opposed to some pre-existing exemption that would be available to it. So this is speculation upon speculation upon speculation. And even sort of one chain of speculation isn't sufficient, but this sort of multiple chains of speculation is what Judge Jones said. This is one of the more attenuated claims. So you've cited Judge Jones' opinion a couple of times. Is there anything that, in your view, is erroneous in Judge Jones' opinion? Oh, yeah, I spoke to it earlier. Judge Jones seemed to be of the impression that the 2020 rule couldn't take effect until these agencies implemented their own internal regulations. That's not the case. But other than that, I think Judge Jones was absolutely correct. I'm so sorry. And your response to that is the rule takes effect, but the agencies have to do something under it to have any… Right, the rule is a procedural rule. There's a lot of discretion. I see. So it doesn't affect anybody, in fact, until the individual agencies act. Is that correct? That's absolutely correct, Your Honor. Okay, sorry, Jeff. I think that's… Okay. Your argument here is the rule, the 2020 rule, has taken effect, but it doesn't affect anybody until these other agencies do whatever they're going to do. That's correct, Your Honor. All right. And we would ask for the judgment to be affirmed. Thank you. All right, thank you, sir. And now we'll hear from Mr. Kimberley. Thank you, Judge Agee. If I may, I'll start. I'd like, if I can, in the short time that I've got, briefly to address the question of an abeyance and then touch on the merits and offer what I think is a middle ground between the parties here. So first, as to an abeyance, Judge Nguyen, I think what would make an abeyance not warranted in this case, at least in its current posture, is that the district court's decision was one based on standing. It was not about the merits of the rule itself. And as Judge Motz noted, the likelihood that there's going to be further rulemaking in this area is high. And at this point now, the parties have spent more than a year litigating just the question whether the court has the authority to decide these sorts of challenges. The case is fully briefed and presented to this court just on the question of standing. And I think having the court's guidance for litigants moving forward on what sort of standing principles ought to guide challenges to CEQ NEPA regulations. How can we get into those complicated standing issues if the rules are going to just change again anyway? Well, I think the answer is, first and foremost, there has been one change, but we don't even have in the two-phase approach to changing the rules. The phase one is done and complete, but that leaves plenty of live controversy here. The phase two rulemaking hasn't even commenced. There isn't even a notice of proposed rulemaking. And as my friend on the other side observed, there's no telling when that's actually going to come. So as of right now, I mean, it's likely to be years before we see a final phase two rule, if ever we do, before the possibility of changing the system. While they're waiting on that, they're being injured in the interim. Well, that's right. And that's why I think it's important for this court to reach the standing question. Of course, our position on that front is that this court should affirm what we take to be a very well-reasoned decision by the district court below, providing helpful advice and guidance to other litigants who might, including my clients, who might find themselves challenging CEQ regulations moving forward. That is a live issue, and it's one that I think would be helpful to have a decision. Can you succinctly tell us from your client's perspective why the injury component of the appellant's argument is incorrect? Right. So on this court, Judge Agee, we would ask the court to apply the same standard for standing that we would hold ourselves to with tables turned. And it's just to say that Article 3 requires allegations that are concrete, actual, and imminent, and they can't rest on speculation. So that doesn't describe the harms that the plaintiffs have presented here because they haven't identified, first, a specific federal action, two, that is subject or imminently will be subject to a NEPA review, will be conducted pursuant to the elements of the 2020 rule that they challenge. And I'll come back to that in a moment because I think that's an important point, Judge Mott, to some of the questions you were asking. Four, that result in some identifiable difference in either the scope or manner of the way that the NEPA review is conducted, that in turn is substantially likely to cause the plaintiff's members a concrete harm. And that might be the diversion of resources. It might be the frustration of institutional mission. It might be some environmental impact. At each one of those five steps, the plaintiff's standing declarations fail. And I would point the court to the Burdett Declaration, which is the number one declaration cited in the reply. It was what was just cited in my friend's presentation. There are paragraph 13 of the Burdett Declaration. This is JA 637. The statement is, I am concerned that if the final rule is not vacated, citizen input on project design will no longer be possible. No indication of an actual federal action to which NEPA review would be required, the ways in which citizen input would be inhibited, the ways in which that might influence the course of the NEPA review resulting in injury. I would say also, Judge Agee, to your point about informational injury, the injury, this court's cases teach that that kind of injury is really only applicable when there is an affirmative legal right to receive information. And that information is being deprived. But as the D.C. Circuit held in the case that we cite in our brief, this is the Foundation on Economic Trends case. I'll just cite briefly from that case. An organization's desire to supply environmental information to its members and the consequent injury it suffers when the information is not forthcoming in a NEPA review without more is not enough in first standing because it would apply really to anybody. That is a generalized term. In your stand, intervene in this matter. The intervening, I suppose it's first an open question whether defendants, defendant interveners have to establish Article 3 standing, which is typically a standard. What would give you standing to be in this case? So our standing, if it were something that we had to prove in this case, would follow from the same basic standards that I just described. We have members who have identifiable projects that are under NEPA review. You're being regulated. That's exactly right. We participate in the NEPA review. So that's regulations that are directed to you. So you think that's enough to overcome the speculative aspect, just like the other side. That's right. Our members' participation in NEPA reviews when they're the ones, for instance, seeking permits is mandatory. Your regulation is just directed to you as the other side. That's good enough? Well, actually, just to clarify a point that Council for CEQ just made, these are really regulations of agencies. The way that the agencies implement these NEPA regulations is by conducting NEPA reviews. So we still have to have a NEPA review as to which these rules apply. If it were, for instance, a challenge to the Phase I rule, we'd have to show, for instance, that a member had a pending NEPA review, that the Phase I rule would apply, and that it would inflict costs as a consequence on our members, for instance, further delay in the completion of the NEPA review or more burdensome analyses in the NEPA review. And our point is simply that the same standard should apply to the plaintiffs. But you say they don't have standing. I think that's the gist of my colleagues. They don't have standing. I don't understand how even a parallel case came up. And you had to challenge these rules in the specific, in the first instance. I'm just thinking about you and how you get here. I'm saying you think of intervening. You don't need all three standing just to intervene, kind of get into it. But I'm just thinking, you're standing here before us arguing. We have some basis for doing so. And with the table turned, as I say, we would have to prove what I've just shown. Judge Motz, to your point, our disagreement with the plaintiffs is simply that what they have put forward, the 52 declarations that they've put forward, fail at each step that I've suggested would be necessary. They don't actually identify any particular federal action to which NEPA review would apply under these rules. I think I understand what you're arguing. What we're asking you is, what is your role here? And you're just saying, because we're an intervener, we don't have to show standing. Is that what you're saying? Well, I take the, yes, our first point is that it's pretty comparable to their standing. I'm sorry? I would say that your standing, if you had to prove standing, is pretty comparable to the plaintiffs. Well, I think the point is that a defendant doesn't have to prove Article III standing. But what's your interest in the case? Yes, our interest in the case. The same basis they got. You think you're being regulated. And that's speculative from their perspective. But from yours, you think it's something that gives you enough to be able to intervene in a case and argue just like you're the party here in front of us. Well, respectfully, Your Honor, we are a party. We're an intervener as well. No, no, but there are very important distinctions. I'm going to have to really study that one now, the intervener, to see if you can just boss in anybody without any standing and just intervene. It has to be something. We have a basis there. It was just an interesting point. You don't have to go into it from my perspective, but it was just interesting when I was sitting here thinking about who are you. I said, you're in the same position as they are. You're being regulated. And you feel like, well, that affects me. And yet you say they don't have standing. They don't have enough to be here. No, so, Your Honor, the distinction is I think you've just got to have a concrete injury. And so all they put forward is sort of general speculation about concern for information. Well, if you brought a parallel case, you'd have to have a specific injury. We would have to have a specific injury. We'd have to show. We don't have any such thing now. Well, we haven't submitted declarations to the court because, again, that wasn't part of it. We don't have anything. You know, you're just in the same position. But, Your Honor, again, if I may complete the thought. It seems like your point would be, well, yeah, maybe I don't have any kind of standing here, but that just proves they don't either. Well, I suppose that would be the case. Although, again, the distinction is so if they could come forward and show, for instance, that they had a member that was participating in a particular NEPA review, that they were demonstrably being denied information that was available to them before under the old rules that is now not available to them under the new rules. And in the course of that actual rulemaking, that actual NEPA review, they therefore had to incur expenses, real expenses, say, filing and litigating FOIA litigation. They would have standing. Sorry. You're good. Well, I was just going to ask. Sorry. It's still early. Okay. Yes, I'm fine. All right. Thank you very much. Thank you. All right. Miss Hunter, you have rebuttal time. Thank you, Your Honor. Excuse me. Before you start, my colleague said at one point, the 2020 rule is in effect, but doesn't have any effect. Isn't that correct? It's not, Your Honor. It sounded like it pretty much. It is in effect, and it is, as the Supreme Court said in Andrus, CEQ regulations are binding on all federal agencies. And I believe CEQ's counsel admitted today that agencies do not have to put their own implementing regulations in place for the rule to take into effect. Counsel, if you want to remove your mask, that will make it a little better. And, you know, we noted this in our reply brief. For example, on page three, we point to a Forest Service EIS where it says, quote, all projects with notices of intent initiated after September 14th, 2020, will use the new regulations. That is just the law. This is the law on the books. And despite what my opposing counsel said, this is not a fully discretionary rule. Which regulations is it that they're going to use? Because I thought I understood opposing counsel to say that he thought there weren't any new regulations implementing the 2020 rule out there. So what specifically are you saying is a regulation that injures you now? Yes. So they will use the CEQ regulations as agencies generally do. And as cases which have come before this court, for example, the Department of Transportation relies on those CEQ regulations. And what those regulations do, and there are hundreds of changes in these regulations. For example, they change when the agency has to use up-to-date scientific information. They change the standard for when plaintiff groups can get into court and really raise the bar of what they have to do for exhaustion. So that is a harm that happens now to plaintiffs today because they have to meet that exhaustion standard or risk losing something. Can you explain to somebody that has been harmed by any of this? I know you say in the sphere your clients are all being harmed, but that has actually partaken in this procedure? Well, where we are at this point, Your Honor, is plaintiffs who don't know whether NEPA is being used or not. Because they have previously relied on the NEPA process to alert them to when NEPA reviews will take place. But because this regulation specifically exempted, with no discretion, certain types of categories of environmental reviews from meeting any NEPA review, those plaintiffs are harmed. I can point to specific groups like Cowpasture River Association, like Mountain True, who rely on Forest Service regulations, which have been changed in accordance with the 2020 regulations, to exempt larger stands of trees from the NEPA process. And there are specific examples which are moving ahead today under those categorical exclusions which were promulgated under this new regulation. Another example would be the Mountain Valley Pipeline, which needs additional NEPA review from the Bureau of Land Management. And today, the law on the books, as I stated, is that the 2020 rule is what applies today. Okay. Now, I know you want to tell us everything, but it actually is important for you to listen to what we are concerned about. And so, what would you have us do about all of those things? What is it you want us to do? You want us to reverse the district court and do anything else? And remand to the district court to hear our motions on summary judgment, Your Honor. The CEQ is no longer defending the rule on the merits, and we would like the rule to be vacated. And just to answer Judge Wynn's concerns before about why this is important, there has already been an attempt by Congress to vacate Phase 1 of these regulations. If there is another election, as you recognize, Judge Motz, we could be in a very different situation. And it's really important for us to… So, why does that help you? Because right now, the law of the land is the 2020 regulation, and there needs to be some legal clarification on the question of whether that 2020 rule was promulgated according to law, according to the requirements of the APA. That is the question that these plaintiffs want answered. And we want to be sure that if that rule was illegally promulgated, it is stricken from the books, and the 1978 regulations again become the baseline from which CEQ can work from. So, why can't you challenge, make those challenges in the first instance? So, in your example, why wouldn't you challenge it then when you've got a very specific concrete harm as you see it? That they're cutting trees that before they wouldn't have cut, and that creates an injury that's cognizable. Why wouldn't you do it then? So, I think there's two reasons, John. First of all, that would be a challenge to the Forest Service, but the bad actor here is CEQ. It's CEQ's rulemaking which is the problem here. You could challenge both of those at that time. And the second reason is that plaintiffs, and this court has recognized this in Gaston Copper and other cases, plaintiffs in environmental cases do not have to wait until trees are being cut down in order to have an injury. The redressability and eminence requirements for environmental standing is significantly lowered for that reason. And at the time the plaintiffs brought this case, their harm was eminent. And we have seen that harm play out as these plaintiff groups no longer have that procedural tool and that notice that they had in the past to use. And they've had to shift their missions accordingly. And they may result now in not being able to get into court to challenge projects harmful to them because of the changes in this rule. And that's real harm to community groups who can ill afford experts to do that comment writing for them. All right. Anything else you want to tell us in about 30 seconds? I think the key point is that this is not a speculative rule. Yes, we are grateful for these changes to indirect and cumulative impacts and alternatives. But there are a number of other really key provisions that were changed in the 2020 rule which are in place today, which mandate that agencies have to do less than they previously did. And to suggest that agencies are just going to voluntarily go above and beyond what the baseline is, the significantly lowered baseline is a type of speculation that courts have found strains credulity. And with that, I would ask that you vacate the district court's opinion and return this for a full hearing on summary judgment on the legality of that rulemaking. Thank you. All right. Thank you very much. We appreciate the arguments from all counsel. And we regret we're not able at this time to come down and greet you as we normally do and hope you'll return on another occasion when we can do that. So with that, I'll ask the court to adjourn court until our next session.
judges: G. Steven Agee, James Andrew Wynn, Diana Gribbon Motz